Parts v. Genuine Parts  May it please the Court, my name is Bruce Jones. I represent General Auto Parts. General asked this Court to reverse the District Court's decision granting summary judgment to defendants on General's Robinson-Patman Act price discrimination claims, claims involving a volume discount program offered by defendant Genuine Parts Company. The District Court erred both in its application of the law and its failure to find issues of material fact, including granting defendant's motion for summary judgment. General is a single-store, independently-owned business in Boise, Idaho. It sells NAPA-branded automotive parts at the retail level. Genuine Parts Company, through its NAPA auto parts subsidiary, sells and distributes automotive parts to Plaintiff General and to defendant Dyna Parts, the other NAPA jobber or retailer in the Boise market. Defendant Dyna Parts owns four NAPA stores. General owns one. The Dyna Parts stores literally surround General Parts. The problem is not that they surround them. The problem is that stores in order to buy higher volume in order to obtain greater discounts. Both plaintiff and defendant Dyna Parts order their inventory out of GPC, Spokane Warehouse, with both stores buying at least 95 percent of their inventory from GPC. GPC offers a volume discount program. The price of a particular part depends on the volume that is purchased. The differential between General's and Dyna Parts' purchase price for the same product is dramatic. General's economist identified over 10,000 purchase transactions from May 2004 through July 2005, where during the same pricing period, that is, they were ordered from both Dyna Parts and General within the same 30 days, defendant GPC sold identical parts to General and Dyna Parts at different prices. During that time And that's caused by the volume discount. Absolutely. And so your argument is that there's unlawful price discrimination because functional availability means that your client has to be able to get it, on terms that aren't onerous, and that your client isn't able to do that because your client doesn't have the line of credit or the storage space to order in large bulk. But these other parts stores that are in Boise, which are owned in part by GPC and who are located in close proximity within two miles of your client's store, are able to do that. And is that basically what your argument is? That's a good summary, Your Honor. Well, why didn't you give us a summary like that if it's so good? First of all. So that's your argument. So what's the evidence that supports that? All right. The evidence. And what are the disputed fact issues? I mean, that's what you're after. You want to go to trial, right? First of all, Your Honor, under the Robinson Patent Act, under the Texaco versus Hasbro case, the United States Supreme Court stated that for purposes of discrimination under a 2A Robinson Patent Act, discrimination means simply a difference in price. Of those 10,000 transactions that I just referenced, General paid 11.8% more than Dinah Parts for identical parts 84% of the time. Excerpt of record at 106 and 107. Anecdotally, Mr. Workland, the owner of General, went to Dinah Parts and purchased parts at a price lower. Dinah Parts' retail price was lower than General could order the part from GPC out of the Spokane warehouse. To what extent does this discrimination exist? I guess the question is, did he have to order out of the Spokane warehouse? Yes. If you're going to be a NAPA parts dealer, jobber in this region, the answer is yes. And that's why both Dinah Parts. Well, the discount you get, though, is from not getting it from the Spokane warehouse. You can order through them or something, but you handle, you know, it comes to you directly from a manufacturer. It is shipped directly from the manufacturer. The discount is arranged for and negotiated by GPC, General Parts Company. So it is, in fact, GPC that is effectively offering the discounts. And then are you eligible for those discounts? Not to the extent that they are, but you don't have the means to take advantage of them. I guess it goes back to the classic Morton Salt argument. Yes, theoretically, every jobber, every retailer that buys parts from General is eligible for the discount. In the real world, because of the inherent structural limitations of being limited by the amount of product they can order and the inherent financial constraints of being a small retailer, no, they can't. And that was the argument that was presented to the United States Supreme Court in the Morton case 60 years ago. In Morton, it was truckloads of salt. There were multiple levels of retailers, supermarket change, wholesalers, and small supermarket change. Morton Salt ordered, it's equally available to all. The United States Supreme Court said, no, it may be theoretically available, but it is not functionally available, and therefore, you have price discrimination. And that is the essence. What's the evidence on the escalation of the discounts over volume? In other words, if there was simply a discount at a particular volume, and it's a volume you could achieve, at least in places, the fact that more of the same discount is given to a bigger outfit wouldn't necessarily cause price discrimination. Is it progressive is what I'm trying to get at. It is. The larger the volume, the more the discount. And it's pretty interesting. This fact is undisputed and comes from GPC's own affidavit that Dynaparts was able to qualify for the discount program 89.2 percent of the time. General could qualify for the discounts only 2.4 percent of the time. So I think that demonstrates the magnitude of the real world price discrimination inherent in the volume discount program. Well, that wasn't exactly my question. I mean, is there an example you can give me of a discount where it goes sharply up when the quantities are so large that most small purchasers wouldn't have a chance of getting that discount? I wish I could point to you a specific excerpt of record. But in general, yes, it would be, for example, volume or a caseload or a truckload of oil versus 10 caseloads of oil. That's the way they structure it. It's they have, you know, of the 10,000 transactions, they all vary on the discount. But if you analyze it, the overall discount afforded to Dynaparts is 11.8 percent greater, if that answers your question, Your Honor. Apparently, there are a lot of independent people who purchase. There are a lot of independent NAPA people who do order under a discount system. I don't know to what degree. Is there anything in the record about that? Well, yes, there is, Your Honor. And that's an interesting issue that the district court failed to resolve. In initial discovery, General sought discovery on other NAPA jobbers outside of the Boise area. We filed a motion to compel. The defendants objected. And the bottom line was the court ruled that we could not do discovery on any dealerships outside of the Boise area. So having failed to do that, when we get to the summary judgment stage, then the defendants submit affidavits from other dealers out of state saying, of course, you can participate at a higher rate. So our view is, number one, our motion to strike should have been resolved by the district court. And number two, the defendants, having initially resisted and actually gotten an order on a motion to compel, saying that we can't do out-of-state discovery in regard to these other dealerships, are precluded from even admitting that evidence. Well, these other defendants, these other stores within the two-mile radius of your client's store, those stores, I think there were three of them, all had a common ownership. Correct. And that GPS was one of the beneficiaries of that common ownership. And so they all purchased together as a group, so they got a bigger discount. Correct. And so that since they were in close proximity to your client's store, that that, you know, amounted to pricing discrimination and was calculated to run the amount of business. I mean, that's your argument, right? That's the essence. The fact that the other four stores are able to aggregate their purchases and get a greater discount is price discrimination and a prima facie case of price discrimination under Section 2A. And there's a common thread of ownership on those other four stores. Well, that's an element of it. There's a line of cases out there, old cases, on even if it wasn't common ownership, if they had entered into a purchasing combine, you would still have the same effect and it would still be a violation. You do have that common ownership here. Yes. And here we have a common ownership. Is the market essentially the Boise area? Yes. That was stipulated by the parties. How many other companies are buying in that market besides the people involved in this case? In terms of all other auto parts stores or just the NAPA branded stores, Your Honor. Well, which area do you think you're in? Well, I think we're clearly we're in the NAPA. All right. How many other stores are buying in that area? Just Dynaparts stores and General stores. Only those two? Only those four stores that buy NAPA parts. That's all there is? Yes. Of course, there are other competitors out there and probably 30, 40 stores owned by other companies. So they're not buying? They're not buying under this discount program offered by GPC. Am I from G? Do you buy other things? I don't. I couldn't exclude every purchase. But, no, it's basically shucks. They have their own parts. What we have here is simply just those dealerships that want to sell the NAPA parts. You want to save some time? Yes, I would like to reserve. I think I'm down five minutes, and I'd like to reserve my time. Thank you. May it please the Court. Randall Allen, Virginian Parts Company. I would like to take 15 minutes and reserve 15 minutes for counsel for Dynaparts. Mr. Barker, who's here with me here today. Five minutes. Right. And I'll try to keep an eye on the clock and make sure that I do that. I realize that's my responsibility. I want to try to address some of the questions that were coming up. This is not a program. I think the case that Mr. Jones referred to is Morton Salt. In Morton Salt, you had a program that was only available to five purchasers. It was not available to the mom-and-pop stores, if you will. So, obviously, General wants to pigeonhole this case into the Morton Salt case, but it simply doesn't fit. This is a program that was designed for a nationwide network of jobbers. As the record reflects at ER Volume 2, 127, 80 percent of those stores are single-store jobbers, just like the plaintiff appellant in this action. So this is not a program that was designed for big stores that can only be utilized by big stores. To the contrary, this is a program that was designed for small stores to compete with the other competitors in the Boise market, the 30-some-odd stores that Mr. Jones was referring to. So to characterize it as a, if you will, a program unique to diner parts because they have four stores is a mischaracterization at best. Second of all, with regard to the size of the program, I think the example that Mr. Jones gave was if you bought a truckload of product, you would get a larger volume discount. There are no truckload discounts at issue in this case. The record reflects, in fact, that General could have availed itself of the discounts at issue in this case if it had not purchased more product, but simply purchased its product in a different pattern, if you will. I think the example was General is a very large purchaser of oil filters. And if General had simply, instead of buying its oil filters one at a time, which is how it purchases them, if it had purchased its oil filters once every two weeks, for example, it would have received an additional 10 percent discount. But General adhered to an inventory management system that General, in its own wisdom, decided worked for it. And that was when a customer would come in and purchase an oil filter, General would that evening, either electronically or telephonically, order one oil filter. That oil filter would be loaded on a truck, which makes an every night delivery from Spokane to Boise. That oil filter would be loaded on the truck, and the next morning it would be delivered to General. That's certainly an inventory management system that General has determined in its own wisdom has worked for it since 1974. But it is not an inventory management system that helps it take avail, if you will, of the volume discount programs that were available. If I could speak to one other issue that came up in argument, and that's the ownership issue. Genuine Parts Company does not have an ownership interest in Dyno Parts. Genuine Parts Company did have an ownership interest in Dyno Parts in the past. I don't believe that ownership interest is actually at issue in this case. Well, you know, this whole thing is a very difficult diagram, and I wish that had been done. But let me see if I'm right on this. In 1957, a Boise jury awarded General $100,000 in damages for GPS's, GPC's breach of contract. And then in 2000, Dyno Parts, which was owned by GPC and Robert Dyson, who was a former GPC manager, took over four Napa Auto Parts stores. And those stores were, at that time, owned by GPC. And Dyno Parts was a joint venture between GPC and Tyson's Inc. And Tyson's Inc. includes as a principal Bob, I mean, Dyson, Bob Dyson, an employee of GPC. And that's the way this thing's going, huh? Let me see if I can't correct a few, Your Honor, if I may. And then General files this action alleging that GPC's quantity discounts unlawfully discriminate against General and favor Dyno Parts. That's the way I look at it. Your Honor, with one exception, GPC has not had an ownership interest and does not have an ownership interest in Dyson Inc. or Dyson Auto Parts for quite some time. Well, they had it in 2000. Is that right? Your Honor, they may have had it in 2000, but I do not believe that 2000 sales are at issue in this case. No, but I'm just, you know. At one point in time, there was a venture that included both Dyson and Genuine Parts Company in Boise for the operation of those stores. It is no longer. It was a program that Genuine Parts. Your Honor, you could look at these facts as an attempt by these other folks to drive General or this fellow Frank, I forget his last name. Workland. Frank Workland. Yeah, Workland out of business. Except for one thing, Your Honor. You could look at it that way, couldn't you? Only, with all due respect, because I hope the Court's not looking at it that way, only if you were paranoid. Because here's the reason. Oh, paranoia. I wouldn't be paranoid if everyone went out to get me. The concern here, Your Honor, are the programs that are instituted by Genuine Parts Company discriminatory to General. The programs here are not designed for General, and they're not designed for Dyna Parts. They're nationwide programs that are designed, frankly, for stores just like General. So the programs aren't designed to be discriminatory, and they're certainly not designed. These other four stores are interrelated, aren't they? They are. Yes, Your Honor. Interrelated. So they can put all their resources together, and they can buy cheaper, right? As could General, Your Honor. But they don't have the resources. That's incorrect, Your Honor. They do have the resources. The record's very clear. This is not a case where General has to buy more to avail itself of the program. I see. Because they've got an inventory program. It's an issue where General has to simply allocate its purchases in a way to adhere to the program. For example, Mr. Jones referenced the fact that in the work that his expert did, they determined that General used the program only 2 to 4 percent of the time, and Dyna Parts used it 80 percent of the time. Well, we offered unrebutted evidence from other jobbers who use it 60, 70 percent of the time. There's no question about the fact that as Discovery began to close in this case, General upped its participation 10 percent simply by changing its purchases. So the question is, is the program available to them? They don't have to borrow money. They don't have to buy more. They don't have to spend more. At their current levels, they could avail themselves of the program to a far greater degree, and we've spelled that out in detail for the district court. It had that big line of credit. It was a big line of credit. I don't believe there's a line of credit that's at issue. General had a big line of credit, but it wasn't used for the purchase of automobile parts. I believe it was in the range of about $150,000. But I don't believe that line of credit was used for the purchase of automobile parts. I thought one argument was that General did not have the cash flow or the storage space to use the program. Is there anything to those arguments? Let me answer directly first, no. And now let me explain why. For the reasons that I'm saying, that is the point. When it came time to explain the application of the programs, we went through on a line-by-line basis because the discounts are negotiated on a manufacturer-by-manufacturer basis and explained, for example, with oil filters. If they would order every two weeks, they could get another 10 percent. If they would order every five weeks, they could get another 12 percent. All they needed to do was to change their pattern. Now, when it comes to why does General say that it cannot avail itself of the program, there's two record sites I would like to point out to the Court. The first one is at ERV 227. When asked why he did not utilize the program, and the question was could he not, could he afford to do it, his answer was that he could, but it does not make sense. It didn't make sense to him to manage his inventory that way. And in addition to that, at SER 80, when asked again about whether or not he had done an evaluation of the cost of borrowing money or even the cost of renting an additional warehouse space, if he needed more space to store his product, the question was have you evaluated those alternative means of managing your business to determine whether you could make more money if you simply used your credit line to do that. His answer was no. I've not done any evaluation to determine whether the program would be a good thing or a bad thing for me. So sorry, Your Honor. Can functional availability be established by showing that there's a sort of a general availability even if there's none to general? Is your question can it? I believe under the law. I wonder how specific does functional availability have to be to the plaintiff is what I'm kind of getting at. Well, I think the answer to your question is I believe under the proper application of the law it could be general. But in the evidence, what we attempted to do quite candidly is answer both questions. And so we presented evidence about the design of the program for the other 5,200 single store operations in the country. I'm overstating that. It's more like 4,900 single store operations in the country. So we developed evidence from other single store jobbers who used the program that General says it cannot use. But then we also developed specific evidence of how general itself could use the program. So we tried to do to resolve both of those questions. And candidly, there's no evidence in this record that it is not a program that is I think the language that some of the cases use is, you know, is the program available to the average person, functionally available to the average purchaser, the average customer. And so we tried to develop that kind of evidence. And I think we gave some examples of dealers in Sandpoint, Idaho, and dealers in Corvallis, Oregon, to point out that it is a program that's available. It's simply a program that General, for its own reasons, has decided not to participate in. You said earlier there are no carload lots. One of the questions I was kind of trying to get at when your opponent was speaking was that Morton Salt wouldn't have been saved by saying we will give a small discount to people who buy a carton at a time, but we're going to keep our big discount for multi-railroad carload lots. In fact, that's the program Morton Salt had. It had a small program for little people and a big program for big people. Well, that didn't save it. And what I'm trying to get at is there any big discount here that is really available only to a very limited tier of purchasers? John, I'm unaware of any discount. And in the record. There's nothing in the record that would indicate that there's a program, for example, that Dinah Parts could participate in that General could not. And if you look at the – it's always fascinating. You get lawyers who look at cases from different perspectives, obviously. Both of the parties have spent a fair amount of time talking about Morton Salt. And it is Morton Salt that birthed the concept of functional availability. And Mr. Jones quoted you the language when he was up here. It said that the discounts were theoretically available, but not functionally. Some courts say practically and some courts say realistically. The common language is functionally available. And so that's how this – that's what this program is designed to be, is realistically and practically available to the other purchasers. But the other thing that Morton Salt focuses on, which is important, is that the point it makes is that the Act is designed to ensure that big companies don't gain a competitive advantage over smaller companies solely because of their purchasing ability. Well, in this case, this is a program that is not designed for big companies. Morton Salt, only five companies in the country could avail themselves of the very top end of the discount. We have thousands of companies all over the country. We've given the Court examples. Can they avail themselves of the top end of the discount? Your Honor, it's designed – the top end is designed for those small stores. And, frankly, it's designed to address the competition, the two-tier distributors. We're a three-tier distributor. You know, it's – frankly, General Parts Company has been around a long time. It's a somewhat older distribution model. And so this program is designed to help our jobbers compete with the two-tier distributors that Mr. Jones referred to. There are 30 or 40 of them in Boise, Idaho. So we're trying to figure out a way to make our jobbers more competitive to lower their costs. So to attack a program that's designed to lower your customer's cost, this customer's cost in particular, I think is somewhat disingenuous and contrary to the purposes of the antitrust laws. The program is a pro-competitive exercise. And let me just say – my time is running out and I need to turn this over to Mr. Parker – that if we have a program that's designed for these other jobbers throughout the country, and if it permits those other jobbers to lower their cost and be competitive with the other brands of automobile part dealership, it sort of stands the purpose of the antitrust laws on its head to say that we can't use that program because General doesn't choose to. To – they're seeking in part an injunction. To enjoin us from using that program because General doesn't choose to, to raise the cost of jobbers around the country, is contrary to the purpose and intent of the antitrust laws. And we would suggest to Your Honor that the – Your Honors, that the district court got it right and we would ask that the district court's decision be affirmed. Thank you. Roberts. May it please the Court. Albert Barker on behalf of Defendant Dinoparts. I want to begin by addressing the Court's questions about the structure of Dinoparts. Dinoparts was formed in about late 1999, and the reason it was formed was because Bob Dyson had come home in 1990, almost ten years before, to Idaho. He had previously, like Frank Workland, had worked for General and Parts Company, and Bob had worked in the Phoenix office. He quit his job. He came home. He was not an employee of GPC at the time that Dinoparts was formed. He took over the stores that his father ran in Ketchum and in Jerome, Idaho, and then built some stores, or built a store in Twin Falls, and started in central, south-central Idaho. Then in the late 1990s, he approached GPC and said, I sure would like to expand into some additional markets. And they said, well, we have these stores that we've been operating in Boise, and they also had some stores in Idaho Falls and Pocatello, which are on the eastern side of the state. So he came to them and said, I'd like to get involved in this. How do I do that? GPC had a program through a relationship that it had with a bank in Atlanta where they would enable the parties or enable jobbers like Bob Dyson, who wanted to expand, to borrow money. Well, in order to borrow the money to buy the stores, to buy the inventory from the stores, GPC had to guarantee the loans, and that was the purpose of the original formation of Dinoparts as a joint venture. Ultimately, Dinoparts, or rather GPC, sold out its interest in Dinoparts to Bob for, and is a, has a loan. The company owes GPC money for the money that it borrowed, but it was not set up as a subsidiary of GPC. Dinoparts would like to continue and needs to continue to use these programs in order to compete with the 30 or 40 other auto parts dealers that there are in Boise. They need the opportunity to be able to purchase it at reduced prices, to be able to get in the door with everybody else who's selling auto parts to the public and to the tire stores and the car repair stores and everything. But I also want to address the court to the question of the concept of knowing receipt and inducement of discriminatory discounts, because that's the issue under which Dinoparts and only Dinoparts is being sued in this case. It's not responsible as a, under Section 2A, it can only be held liable under 2F. And the Supreme Court, in the automatic canteen case, says that knowing inducement means you as a buyer have to know that the seller has absolutely no defense to the ability to provide you with these kinds of discounts. And I see our time is up. If the court has any questions or if you'll allow me to. Well, is there something else you want to say? Yes, Your Honor. I think the knowing inducement question here goes to the fact that the evidence in this case is undisputed, that the only thing Dinoparts ever did was to take advantage of the programs that were made publicly available to every one of the jobbers, that they never went to GPC and said, give me a better discount. They never negotiated. They never bargained with GPC. All they did was look on the computer, look on the bulletins, and use their programs in a way that were made available to every other NAPA jobber, the 5,200 people in the country. Now, how can a person knowingly buy illegally when the seller is telling everybody and encouraging everybody to participate in this program? The knowledge requirement under automatic canteen in Texas Gulf Sulphur versus the J.R. Simclot Company simply has not been demonstrated in the evidence. And automatic canteen says that it's the burden of coming forward with evidence of actual knowledge that is on the plaintiff. And that burden has not been met because there is no evidence of actual knowledge that the seller has no justification here. And the defenses you'd have to know about are functional unavailability, I mean functional availability or meeting competition or cost justification. Correct. And there is no evidence that Bob Dyson or Dynaparts had any knowledge of the cost justification, of the functional availability. There's no evidence that he even knew. In fact, the evidence is to the contrary, that he did not know how Frank Workland and General was utilizing these programs. He had no reason to know that they were not using it the same way that he was. All right. Thank you. Thank you, Your Honor. The Court inquired as to what does functional availability mean. First of all, General doesn't concede that functional availability is the doctrine or has been adopted by the Ninth Circuit. It has by the Fifth and Sixth, clearly. But as set forth in the brief, we don't believe it's been adopted by the Ninth Circuit. If the Court is inclined to adopt the doctrine of functional availability, I think the Court should look at what I think the most recent case of Smith-Hosale v. R.J. Reynolds out of the Sixth Circuit. In that case, the Court defined functional availability as follows. The plaintiff in a Robinson-Patman Act cannot recover damages for lower prices paid by its competitors to the defendant if those same terms were available to the plaintiff from a one practical standpoint and on two equal terms with its competitors. But there is more. There's a – and it ties directly into this situation where Dinah Parts is able to purchase from its four stores and General is limited to one. The Court in the Smith-Hosale stated that discrimination may not be caused by disproportionately small purchasing power or the pricing structure itself. And that is what we have with General, disproportionately small purchasing power or the pricing structure itself. Now, counsel, opposing counsel, said the record is clear that General could better utilize the discount program by better allocating its resources. That is, if it is simply smarter about its ordering, that it could take advantage of the program to the extent that Dinah Parts does. That, Your Honor, is the most hotly disputed factual issue in the entire case, and it was not addressed at all by the district court. General's testimony from Mr. Workland was that he cannot do what Dinah Parts does because of the inherent limitations of a single store, the storage space, and the ability to obtain additional capital to expand. And that is at Excerpt of Record, Volume 2, pages 26 and 27, page 62, and page 83. Now, everything, every factual allegation that you heard from opposing counsel about General being able to, quote, functionally participate in the program was subject to a motion to strike that the district court didn't even address. And it went to foundation. It went to failure to produce documents in discovery. But if I leave here today having conveyed any one thing, that even if the court adopts the doctrine of functional availability, there is a question of fact of whether or not the discount program was functionally available to General. All right. Thank you very much. And the matter will be submitted, and the court will recess until 9 a.m. tomorrow morning. All rise. The court will recess until 9 a.m. Thank you. Thank you. Thank you. Thank you. You're welcome. You're welcome. Thank you so much.  Thank you. Thank you. Thank you. I really appreciate it. See you back on, Bruce? See you, yeah. Take care. Take care.
judges: Pregerson, Canby, Noonan